
CLERK'S OFFICE
A TRUE COPY
Jan 14, 2021
s/ DarylOlszewski
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF WISCONSIN

In the Matter of the Seizure of
(Address or brief description of property or premises to be seized)

ONE ONE-OUNCE CANADIAN COIN CURRENTLY BEING HELD BY THE BUREAU OF ALCOHOL, TOBACCO, FIREARMS, AND EXPLOSIVES IN MILWAUKEE, WISCONSIN

Case Number: 21 MJ 22

## APPLICATION FOR A WARRANT
## TO SEIZE PROPERTY SUBJECT TO FORFEITURE

I, Craig Fries, being duly sworn depose and say:

I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives, and have reason to believe that in the Eastern District of Wisconsin there is now certain property, namely, one one-ounce Canadian coin, currently being held by the Bureau of Alcohol, Tobacco, Firearms, and Explosives in Milwaukee, Wisconsin, that is criminally forfeitable under 21 U.S.C. § 853(a) as property that constitutes proceeds of trafficking in controlled substances or was purchased with proceeds of trafficking in controlled substances in violation of 21 U.S.C. §§ 841(a)(1) and 846, and which property is therefore also subject to seizure for purposes of criminal forfeiture under 21 U.S.C. § 853(f).

The application is based on these facts:

✓ Continued on the attached sheet.

❏ Delayed notice of ____ days (give exact ending date if more than 30 days:_____ is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Craig A. Fries*

Signature of Affiant
Craig Fries, Special Agent, ATF

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone and email.

January 14, 2021 at 10:07 AM
Date and time issued

at Milwaukee, Wisconsin
City and State

William E. Duffin, U.S. Magistrate Judge
Name & Title of Judicial Officer

*William E. Duffin*
Signature of Judicial Officer

**AFFIDAVIT IN SUPPORT OF APPLICATIONS FOR SEIZURE WARRANTS**

I, Craig Fries, being duly sworn, depose and say as follows:

## I. BACKGROUND, TRAINING, AND EXPERIENCE

1. I am a Special Agent with the Bureau of Alcohol Tobacco and Firearms, and have been since July of 2014. Prior to that, I was employed as a Detective with the Atlanta Police Department. As part of my duties as an ATF Special Agent, I investigate criminal violations relating to violent crime, firearms and explosives offenses, including 18 U.S.C. § 922(g)(1) (felon in possession of a firearm) and 26 U.S.C. §§ 5861(d), (e) & (f), (possess, transfer or making a firearm not registered in the National Firearms Registration and Transfer Record). In preparation for employment as an ATF Special Agent, I also attended the Federal Law Enforcement Training Center, and received considerable training in conducting narcotics and firearms trafficking investigations. As an ATF Special Agent, I have participated in numerous investigations regarding the unlawful possession of firearms by convicted felons and have also participated in related investigations concerning the unlawful use of firearms, firearms trafficking, drug trafficking, and arson.

2. This affidavit is based upon my personal knowledge, and upon information reported to me by other federal, state, and local law enforcement officers during the course of their official duties, all of whom I believe to be truthful and reliable. Throughout this affidavit, reference will be made to case agents. Case agents are those federal, state, and local law enforcement officers who have directly participated in this investigation, and with whom your affiant has had regular contact regarding this investigation. This affidavit is also based upon information gained from interviews with a cooperating informant, whose reliability is established separately herein.

3. I submit this affidavit in support of applications for warrants to seize the following defendant properties:

    a. Approximately $522,732.00 in United States currency,

    b. Approximately $1,494.00 in United States currency,

    c. Nine assorted jewelry items, more specifically identified as follows:

        i. Two custom jewelry rings, heavy silver chain;

        ii. One 22K gold chain with "money bag" attached;

        iii. One 30-inch 22K yellow gold chain;

        iv. One 24-inch 22K yellow gold chain;

        v. One eight-inch Russian design bracelet;

        vi. Two small rings; bracelet: "Rene Jr"; cross with mundo;

        vii. One 26-inch 21K yellow gold chain;

        viii. One 27-inch 14K gold chain with an ounce Suisse Bar, serial number A422012; and

        ix. One 26-inch silver chain.

    d. One 24K Suisse one-ounce bar bearing certificate number B109104, and

    e. One one-ounce Canadian coin.

4. Based on the facts and circumstances set forth below, I submit that there exists probable cause to believe that the defendant properties constitute proceeds of trafficking in controlled substances, were purchased with proceeds traceable to an exchange of money for controlled substances, or were used or intended to be used to facilitate the commission of a controlled substances offense, in violation of 21 U.S.C. § 841(a)(1), and therefore are subject to

2

criminal forfeiture under 21 U.S.C. § 853(a) and subject to seizure for purposes of criminal forfeiture under 21 U.S.C. § 853(f).[1]

5. This affidavit is provided for the limited purpose of establishing probable cause to support the requested seizure warrants. Accordingly, I have not included the details of all aspects of this investigation. Rather, I have set forth only those facts I believe are necessary to establish probable cause to believe that the defendant properties described above were used, or were intended to be used, to facilitate the crimes under investigation.

## II. PROBABLE CAUSE

6. The defendant properties to be seized are proceeds of, were purchased with funds obtained from, or were used to facilitate, conspiracy to distribute and distribution of controlled substances, and possession with intent to distribute marijuana and cocaine, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)C), (b)(1)(D), and 846.

**Background**

7. On May 27, 2020, a Confidential Informant ("CI") – working under the direction and control of law enforcement – met with Rene Palma at Sam's Club, on Brumback Blvd., Kenosha, Wisconsin, where Palma purchased six firearms from the CI for $3,000.

8. Based on publicly available information, case agents are aware that Rene Palma was convicted of the felony offense of falsely acting as a public official in *State of Wisconsin v. Rene M. Palma*, Kenosha County, Wisconsin, Circuit Court Case Number 2005CF1352. Palma

---

[1] Notably, the government filed a civil complaint against the defendant property in *United States v. Approximately $522,732 U.S. Currency*, Case No. 2020-Cv-1753 (E.D. Wis.). However, the government filed a notice of voluntary dismissal on January 12, 2020, because the complaint was untimely. Although the government could potentially convert these funds using a "housekeeping order" under 18 U.S.C. § 983(a)(3)(B)(ii)(II), the government believes that a seizure warrant is more appropriate.

3

Case 2:21-mj-00022-WED   Filed 01/14/21   Page 4 of 14   Document 1

was also convicted of the felony offense of manufacture/deliver cocaine in *People v. Palma*, Lake County, Illinois, Circuit Court Case Number 08CF4567.

9. After Palma purchased the six firearms, case agents attempted to conduct a traffic stop of Palma's vehicle. Palma increased his speed and attempted to flee. While driving away from case agents, Palma threw a large red toolbox containing the six firearms out the window of his vehicle.

10. After stopping Palma's vehicle, case agents attempted to arrest Palma. As officers approached him, however, Palma threw his Apple iPhone on the ground causing severe damage to the device. Rene Palma was eventually arrested on May 27, 2020. After Palma's arrest, case agents searched his vehicle and found a backpack containing 13 ½ various suspected narcotic pills, three THC pills, and five packages of edible marijuana – each containing 400mg of THC.

**May 27, 2020, execution of search warrant at Rene Palma's residence, 7XXX 63rd Street, Kenosha, Wisconsin**

11. Later that same day, on May 27, 2020, case agents executed a search warrant at Rene Palma's residence, 7XXX 63rd Street, Kenosha, Wisconsin. The residence is a single family home. At the residence, case agents recovered approximately 1,211 rounds of ammunition, three silencers, a State of Illinois identification card for Rene Palma, a Polymer pistol with an extended magazine, a Desert Eagle 50 caliber pistol, and a Ruger 22 caliber pistol.

12. Case agents located a safe in the basement. Using keys obtained from Rene Palma, case agents opened the safe and located approximately $522,732 in United States currency and assorted jewelry. Case agents also located approximately $1,494 in United States currency in Rene Palma's bedroom.

13. Rene Palma's wife was interviewed on the scene. She stated that she was not aware of any firearms in the house and neither she nor her son owned any firearms. She further stated

that she did not know what was in the basement or in the safe and her fingerprints would not be on anything in the safe. She stated that Rene Palma worked at the Parker and Barrow Tattoo Shop. Palma's workstation was in the corner and covered with white curtains. A picture of her was displayed in Palma's workstation. Palma's wife was aware that Rene Palma served time in prison in Illinois.

**May 27, 2020, execution of search warrant at Parker and Barrow Tattoo Shop, XXXX 52nd Street, Kenosha, Wisconsin**

14. On May 27, 2020, case agents executed a search warrant at Rene Palma's place of employment, Parker and Barrow Tattoo Shop, on 52nd Street, Kenosha, Wisconsin. The tattoo shop has individual work stations. In one work station that was surrounded by white curtains, case agents observed the State of Wisconsin Tattoo license in the name of Rene Palma hanging on the wall.

15. Inside a locked toolbox that case agents opened with keys taken from Palma, case agents found the following:

    A.  A total of approximately 5.5 pounds of marijuana located in three bags and a glass jar;

    B.  Approximately 5.37 grams of suspected cocaine in a baggie; and

    C.  Baggies, scales, and drug paraphernalia.

**Samples of forensic evidence found on Rene Palma's cell phone**

16. On or about June 10, 2020, case agents obtained a search warrant on the Apple iPhone recovered from Palma at the time of his arrest. Forensic review of Palma's iPhone shows that Palma worked with others to distribute cocaine, marijuana, and prescription pills; Palma had numerous drug customers; Palma distributed narcotics at Parker and Barrow; Palma illegally

possessed firearms and ammunition; Palma sold firearms; Palma used drug trafficking proceeds to purchase jewelry and a residence.

17. Forensic review of Palma's phone reflects that he distributed controlled substances from Parker and Barrow Tattoo Shop. For example:

> A. On December 27, 2019, at 10:22 a.m., E.D. texted Palma, "Are you working today?" At 10:23 a.m., Palma responded, "Yes I am." E.D. said, "I need more of those if you got it." Palma replied, "ok come through." E.D. responded, "Ok I'll meet you in the back pinched nerve is kicking my ass." Based on their training and experience, and the investigation to date, case agents believe that Palma was working at Parker and Barrow Tattoo shop and indicated that he had an unidentified controlled substance to provide to E.D.
>
> B. On January 20, 2020, J.K. texted Palma, "Hey bro could I get 20 more of those tonight or tomorrow please?" Palma responded, "When ever you want." J.K. responded, "Cool, could I stop by the shop after work about 6 tonight?" Palma responded, "Ok." Based on their training and experience, and the investigation to date, case agents believe that Palma was working at Parker and Barrow Tattoo shop and indicated that he had an unidentified controlled substance to provide to J.K.
>
> C. On April 22, 2020, Palma texted, "Ana, I can't work due to your paranoia of covid. I can't go to the shop to sell drugs." Based on their training and experience, and the investigation to date, case agents believe that Palma had to decrease his narcotics sales at Parker and Barrow Tattoo shop for fear of exposure to COVID-19.
>
> D. On April 26, 2020, "Mateo," asked Palma, "It's not for me, its for my sister. She's looking for edibles do you have any?" Palma responded, "Yes 20 each." Mateo said, "Nice. Is it the gummy bears?" Palma replied with a picture showing numerous brightly colored packages. Mateo stated, "Nice! What is your address?" Palma stated, "1920 52nd Street Kenosha." Based on their training and experience and the investigation to date, case agents are aware that THC edibles are frequently packaged in multiple quantities contained in small brightly colored plastic baggies that mimic actual candy. Case agents are aware that 1920 52nd Street is the address for Parker and Barrow Tattoo shop.
>
> E. On May 25, 2020, Palma texted B.J.B., "Good morning, I thought about it. I will get one for 2900. If it goes good then I will grab a lot. We can do it at the shop. I am here already." Based on their training and experience,

6

and the investigation to date, case agents believe that Palma was going to obtain an unknown quantity of unknown narcotics in exchange for $2900.

F. On May 26, 2020, Palma texted "Mita," "Ok, I just spoked to him. I will be set up Thursday to pick up. Then I have to do what I have to do." Mita responded, "K so Thursday." Palma stated, "Pricing is going to increase, and trust me I hate doing it. 1350 oz." Based on their training and experience, and the investigation to date, case agents believe that Palma obtained a large quantity of cocaine and was going to break it into smaller quantities. Palma stated that he was going to sell ounces of cocaine for $1,350.

18. Forensic review of Rene Palma's phone reflects that he worked with others to distribute marijuana, THC edibles, THC vape cartridges, methamphetamine, psilocybin mushrooms, cocaine, and prescription pills to numerous customers between at least April 2019 and May 2020. For example:

A. On April 19, 2019, Palma texted "Nik," and asked, "Are you selling?" "Nik" responded, "Getting for someone that's helping me. I'm asking you. Two off a couple tattoos. And you know what tattoos means. I need to from you." Palma replied, "I am sorry what do you mean? Your code language is horrible."

B. On December 20, 2019, "Mateo," texted Palma, "Can I stop in to pick up a couple carts?" Palma responded, "Yes that's fine." Based on their training and experience, and the investigation to date, case agents are aware that "carts" is a slang or code word for a THC cartridge.

C. On January 14, 2020, "Mateo" texted Palma, "Do you also have shrooms?" Palma responded, "Yes sir." Based on their training and experience, case agents are aware that "shrooms" is a slang or code word for psilocybin mushrooms.

D. On January 22, 2020, Palma responded, "I do have those 30s in stock or 20s. Your call 6 for 20s or 9 for 30s. Whatever amount you want. I have plenty." J.N. responded, "Ok cool. How about 50 of the 20s?" Based on their training and experience, and the investigation to date, case agents believe that Palma said that he had unidentified prescription pills for sale. Palma charges $6 for 20milligrams and $9 for 30milligrams of the unidentified controlled substance.

E. On February 26, 2020, at 12:26 a.m., B.J.B. texted Palma a picture of a green leafy substance. At 12:27 a.m., Palma responded "looks good."

7

B.J.B. stated, "Ok so ask for the other 8 in a different kind." Palma stated, "575 tomorrow." At 11:37 p.m., B.J.B. asked, "Hey Bro where did you want me to take this." Palma responded, "My house is good. When?" B.J.B. stated, "Right now in 16 min." Palma texted, "Make sure its wrapped right and all weighted out correctly?" Palma continued, "6pm. Infront of safe. In white container on the floor, inside brown hoodie. That's where the money is. Leave product wrapped in brown hoodie inside container." Based on their training and experience, and the investigation to date, case agents believe that Palma obtained a distribution amount of marijuana from B.J.B., which B.J.B. delivered to Palma's house and placed in front of the safe.

F. On March 4, 2020, Palma texted B.J.B. and asked, "Could we get more of what we got?" B.J.B. responded, "Yea I can text him..the same amount?" Palma replied, "yes, one pound." B.J.B. asked, "half and half or all one kind?" Palma replied, "same half and half please." B.J.B. stated, "Ok Bro. Bro, he has it ready today." Palma asked, "Ok do you want me to drop money off? Or how do you want to do it?" B.J.B. stated, "Yeah bro if you cause I won't be able to get that from atm." Based on their training and experience, and the investigation to date, case agents believe that Palma obtained one pound of marijuana from B.J.B. Palma provided B.J.B. with a large amount of cash that B.J.B. then gave to the source of supply of marijuana. Based on their training and experience, case agents are aware that pounds of marijuana typically sell for $1,500 to $3,000 depending on the quality of marijuana.

G. On April 6, 2020, K.P. texted Palma, "wondering if you have any cartridges for pen I can buy from you. Just let me know." Palma responded, "Yes, I have whatever you need." He went on to state, "I also have gummies and several different flower types." K.P. asked, "How much for cartridges? And gummies?" Palma replied, "40for 1 or 70 for two carts. Gummies are 5 each or 40 a bag." Based on their training and experience, and the investigation to date, case agents are aware that drug traffickers distribute cartridges for vape pens which contain concentrated THC. Case agents are also aware that drug traffickers distribute marijuana edible products, including but not limited to THC gummies. Case agents are also aware that flower is a common code word or slang term for marijuana, which comes in different strains. Therefore, case agents believe that Palma told K.P. that he had various products containing THC as well as marijuana for sale.

H. On April 28, 2020, Ana texted Palma, "you sell drugs."

I. On May 9, 2020, J.M. texted Palma, "My town dry on white. I need a decent amount can you hook it up w some? I need 8 ounces of some scamma shit. If I'm satisfied I'll get more." Based on their training and experience, and the investigation to date, case agents believe that J.M. wanted to obtained

eight ounces of cocaine from Palma. If J.M. was satisfied with the quality, J.M. would purchase more from Palma.

19. Additionally, Palma's iPhone contains photographs of numerous suspected controlled substances, including suspected methamphetamine, marijuana, and psilocybin mushrooms. Palma's' phone also contains multiple photographs of firearms.

**Jewelry Purchases**

20. Subsequent to Palma's arrest and the execution of the search warrants, case agents conducted an investigation into Palma's financial activities. The financial investigation revealed that Palma made over $128,000.00 in jewelry purchases from four jewelers between October 2017 and July 2019. During this time, Palma also made large cash deposits to two bank accounts in 2019:

  A. Regal Jewelers Inc.- in October 2017 Palma purchased 2 ounces of 24k gold for $2,620.00 with cash and a 22k gold chain and pendent for $7,370.00, payment source unknown. In March 2018 Palma purchased a 24k gold chain for $54,600.00 with cash.

  B. CoCo Diamonds Custom Jewelry- in August 2018 Palma purchased an unknown jewelry item for $5,500.00. In September 2018, Palma purchased an unknown jewelry item for $5,500.00.

  C. Mile High Jewelers- in June 2019 Palma purchased a 14k gold Miami Cuban chain with a 14k yellow gold custom money roll pendent for $42,500.00. Palma paid for the jewelry piece with a series of six cashier's checks that were purchased at TCF Bank between April 16, 2019 and June 14, 2019 ($9,800.00, $9,800.00, $9,900.00, $8,000.00, $2,500.00 and $2,500.00). All of the cashier's checks were purchased with cash by Palma.

  D. James Allen Jewelers- in July 2019 Palma purchased a 1.5k diamond engagement ring, a 14k white gold matching diamond ring and 14k white gold wedding ring for $11,926.55.

  E. TCF Bank- in 2019 Palma maintained checking account #3736057725 at TCF Bank. A cash deposit of $9,330.00 was made to the account on July 1, 2019 and a cash deposit of $9,700.00 was made to the account on August 21, 2019.

F. Chase Bank- in 2019 Palma maintained checking account #539512555 at Chase Bank. A cash deposit of $9,000.00 was made to the account on October 10, 2019.

**Financial Investigation**

21. Pursuant to a court order, case agents obtained the tax returns and return information for Rene Palma for the years 2107 to 2019. Palma filed a Form 1040 for tax year 2017 with a single filing status and a reported total income of $1,704.00. Palma represented that his income in 2017 was derived from self-employment as a tattoo artist. A Schedule C Profit and Loss schedule was attached to the tax return reflecting $36,395.00 in gross receipts, $34,691.00 in business expenses and a resulting net profit of $1,704.00.

22. Palma filed a Form 1040 for tax year 2018 with a single filing status and reported a loss of ($3,633.00). Palma represented that his loss income in 2018 was derived from self-employment as a tattoo artist. A Schedule C Profit and Loss schedule was attached to the tax return reflecting $21,349.00 in gross receipts, $24,982.00 in business expenses and a resulting loss of ($3,633.00).

23. Palma filed a Form 1040 for tax year 2019 with a single filing status and reported a total income of $3,389.00. Palma represented that his income in 2019 was derived from self-employment as a tattoo artist. A Schedule C Profit and Loss schedule was attached to the tax return reflecting $24,313.00 in gross receipts, $20,924.00 in business expenses and a resulting net profit of $3,389.00.

24. In total, Palma reported a combined total income of $1,460.00 for the three-year period of 2017, 2018 and 2019.

**Indictment**

25. On January 12, 2021, a grand jury in this district returned an indictment charging Palma with various drug and ammunition offenses as well as financial crimes. *See United States*

*v. Palma*, 21-Cr-14 (E.D. Wis.). Specifically, he is charged with conspiracy to distribute and distribution of controlled substances, including marijuana, a Schedule I controlled substance, and cocaine, a Schedule II controlled substance, in violation of 21 U.S.C. §§ 841(a)(1), 841 (b)(1)(C), and 846; possession with intent to distribute marijuana and cocaine, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C), and (b)(1)(D); felon in possession of ammunition, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2); money laundering, in violation of 18 U.S.C. § 1957(a); and structuring, in violation of 31 U.S.C. §§ 5324(a)(1), 5324(a)(3) and 5324(d), and 31 C.F.R. §§ 1010.100(t), 1010.311, and 1010.313

26. The indictment seeks criminal forfeiture of certain property items pursuant to 21 U.S.C. § 853 which provides that the defendant shall forfeit to the United States any property constituting, or derived from, proceeds obtained, directly or indirectly, as a result of the violation and any property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of the offense. This includes, but is not limited to,

  a. Approximately $522,732.00 in United States currency,

  b. Approximately $1,494.00 in United States currency,

  c. Nine assorted jewelry items, more specifically identified as follows:

    i. Two custom jewelry rings, heavy silver chain;

    ii. One 22K gold chain with "money bag" attached;

    iii. One 30-inch 22K yellow gold chain;

    iv. One 24-inch 22K yellow gold chain;

    v. One eight-inch Russian design bracelet;

    vi. Two small rings; bracelet: "Rene Jr"; cross with mundo;

    vii. One 26-inch 21K yellow gold chain;

viii. One 27-inch 14K gold chain with an ounce Suisse Bar, serial number A422012; and

ix. One 26-inch silver chain.

d. One 24K Suisse one-ounce bar bearing certificate number B109104, and

e. One one-ounce Canadian coin.

## III. CONCLUSION

27. Based on the facts and circumstances set forth in this affidavit, I submit that there exists probable cause to believe that the below properties constitute proceeds of trafficking in controlled substances, were purchased with proceeds traceable to an exchange of money for controlled substances, or were used or intended to be used to facilitate the commission of a controlled substances offense, in violation of 21 U.S.C. § 841(a)(1), and a protective order would not be sufficient to assure the availability of the property for forfeiture. As such, the following properties are subject to criminal forfeiture under 21 U.S.C. § 853(a), and subject to seizure for purposes of criminal forfeiture under 21 U.S.C. § 853(f):

a. Approximately $522,732.00 in United States currency,

b. Approximately $1,494.00 in United States currency,

c. Nine assorted jewelry items, more specifically identified as follows:

i. Two custom jewelry rings, heavy silver chain;

ii. One 22K gold chain with "money bag" attached;

iii. One 30-inch 22K yellow gold chain;

iv. One 24-inch 22K yellow gold chain;

v. One eight-inch Russian design bracelet;

vi. Two small rings; bracelet: "Rene Jr"; cross with mundo;

vii. One 26-inch 21K yellow gold chain;

    viii. One 27-inch 14K gold chain with an ounce Suisse Bar, serial number A422012; and
    ix. One 26-inch silver chain.

  d. One 24K Suisse one-ounce bar bearing certificate number B109104, and

  e. One one-ounce Canadian coin.

###